UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GIA ZAMUDIO-SOTO, et al., | Case No. 15-CV-00209-LHK |
| Plaintiffs, | **ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS MOOT** |
| v. | |
| BAYER HEALTHCARE PHARMACEUTICALS INC., et al., | Re: Dkt. No. 90 |
| Defendants. | |

Plaintiffs Gia Zamudio-Soto ("Zamudio-Soto") and Fernando Soto ("Soto") bring this action against Bayer Healthcare Pharmaceuticals, Inc. ("Bayer Healthcare"), Bayer Pharma AG ("Bayer Pharma"), and Bayer OY (collectively, "Bayer") for personal injury and related causes of action arising from the use of an intrauterine device ("IUD") called Mirena. Before the Court is Bayer's motion for summary judgment, ECF No. 90 ("Mot."), as well as Zamudio-Soto's and Bayer's motions to exclude expert testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and under Federal Rule of Civil Procedure 37(c)(1), ECF Nos. 91–93. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Bayer's motion for summary judgment and DENIES Bayer's and Zamudio-Soto's

1

United States District Court
Northern District of California

1    motions to exclude testimony as moot.

2    I.    **BACKGROUND**

3        A. **Factual Background**

4            i. **The Alleged Relationship Between Mirena and Pseudotumor Cerebri/Idiopathic Intracranial Hypertension**

5        Mirena is an IUD manufactured by Bayer. After insertion, Mirena remains in use for five

6    years and prevents pregnancy by releasing levonorgestrel, a progestin hormone, directly into the

7    uterus. Ex. 1 to Mot. at 1, 3. Bayer claims that Mirena is a "safe and effective FDA-approved

8    contraceptive" that is "well tolerated by patients, with high continuation and satisfaction rates."

9    Mot. at 1-2. However, Zamudio-Soto claims that Mirena releases significantly more

10   levonorgestrel than Bayer acknowledges and that this levonorgestrel can increase the risk of a

11   disease called pseudotomor cerebri, also known as idiopathic intracranial hypertension

12   ("PTC/IIH"). *See, e.g.*, SAC p 80. PTC/IIH is a rare disease that is characterized by increased

13   intracranial pressure and has symptoms such as headaches, tinnitus, blurred vision, papilledema

14   (i.e., swelling of the optic disc), and other visual problems. Ex. 11 to Mot., at 1.

15       Zamudio-Soto claims that the connection between levonorgestrel and PTC/IIH was known

16   even before Mirena was introduced. Specifically, a predecessor of Bayer OY manufactured an

17   earlier contraceptive called Norplant, which released levonorgestrel directly into the arm. Ex. 7 to

18   Opp. Zamudio-Soto claims that because of spontaneous case reports of PTC/IIH among Norplant

19   users, Wyeth Pharmaceuticals, the seller of Norplant within the United States, changed Norplant's

20   warning label to identify a possible connection to PTC/IIH. *Id.*

21       Mirena was approved for use in the United States in December 2000 and first marketed in

22   2001. Opp. at 12. However, according to Zamudio-Soto, Bayer knew of a potential connection

23   between Mirena and PTC/IIH even before that time. Specifically, in February 2000, Bayer updated

24   an internal document to reflect that "benign intracranial hypertension" was among the

25   "spontaneously reported adverse events" associated with levonorgestrel. Ex. 10 to Opp.

26       By 2008, Bayer had received questions from the New Zealand Health Authority, the

27

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

2

United Kingdom's Medicines and Healthcare Products Regulatory Agency, and a physician in the United States inquiring about a possible connection between Mirena and PTC/IIH. Ex. 13 to Opp.; Ex. 14 to Opp. In response to the physician, the U.S. Medical Director for Mirena stated that "Mirena does produce significant levels of [levonorgestrel] in the serum" and that this "may exacerbate" PTC/IIH in "especially sensitive women." Ex. 14 to Opp.

According to Zamudio-Soto, various other internal Bayer communications indicate that Bayer knew about a relationship between Mirena and PTC/IIH. Ex. 1 to Mot. However, Zamudio-Soto claims that despite this relationship, Bayer has neither "take[n] the initiative to study this serious issue" nor placed a warning label on Mirena regarding PTC/IIH. Opp. at 11.

According to Bayer, there have been only 115 cases of PTC/IIH out of 120 million women-years of use of Mirena. Ex. 17 to Mot. Bayer states that it closely monitors the reports of PTC/IIH, but Bayer has determined that "the rate of [PTC]/IIH among Mirena users is well below the rate in the general population and does not suggest a causal relationship," Mot. at 3; *see also* Ex. 17 to Mot., at 113; Ex. 18 to Mot., at 413; Ex. 19 to Mot., at 1.

### ii. Zamudio-Soto's Experience with Mirena

Zamudio-Soto received a Mirena device on February 11, 2005, which was inserted by Dr. Jonathan Weiner. Ex. 25 to Opp. Zamudio-Soto's medical records suggest that Zamudio-Soto chose Mirena after consultation with Dr. Weiner regarding various contraceptive options. Ex. 23 to Mot. At the time the Mirena device was inserted, Zamudio-Soto was 5'5" tall and weighed 200 pounds. Ex. 25 to Mot.

In May 2006, Zamudio-Soto began to experience blurred vision, fatigue, and headaches. Ex. 26 to Mot., at 46. Zamudio-Soto's physician at the time, Dr. Suzanne Yokoyama, informed Zamudio-Soto that these symptoms might be caused by allergic rhinitis. *Id.* at 47–48. Three years later, on September 14, 2009, Zamudio-Soto visited an ophthalmologist, Dr. David Kramer, complaining of vision problems and headaches. Ex. 27 to Mot., at 33–34. Dr. Kramer found that Zamudio-Soto had papilledema—swelling of the optic disc caused by increased intercranial

United States District Court
Northern District of California

1    pressure. Ex. 28 to Mot., at 46.

2          The "Patient Instructions" on Zamudio-Soto's medical form indicate that Dr. Kramer

3    informed Zamudio-Soto that her symptoms were "probably caused by" PTC/IIH. *Id.* at 48. Based

4    on this suspicion, Dr. Kramer prescribed the drug Diamox and referred Zamudio-Soto to Dr. John

5    Neely, a neuro-ophthalmologist. Ex. 28 to Mot., at 46. Zamudio-Soto met with Dr. Neely on

6    September 15, 2009. *Id.* During the visit, Zamudio-Soto informed Dr. Neely that she had been

7    suffering from blurred vision and tinnitus for the past year, severe headaches for the past 6–7

8    months, and photopsia (perceived flashes of light) for the past two weeks. *Id.* In addition,

9    Zamudio-Soto had gained 25 pounds in the last two years. *Id.* Dr. Neely confirmed the diagnosis

10   of PTC/IIH on September 15, 2009. Ex. 29, at 52.

11         Zamudio-Soto met with Dr. Neely again on September 28, 2009 after taking Diamox

12   regularly and losing five pounds. Ex. 32 to Mot. At that time, Zamudio-Soto reported significant

13   improvement in her symptoms. *Id.* Zamudio-Soto reported consistent improvement to Dr. Neely

14   over the next several months, from November 2009 to January 2010. Ex. 31 to Mot., Ex. 34 to

15   Mot.

16         On February 22, 2010, after five years of continuous use, Plaintiff had her original Mirena

17   device replaced with a new Mirena device, which was inserted by Dr. Wesley Leong. Ex. 35 to

18   Mot. At the time the second Mirena device was inserted, Zamudio-Soto weighed 184 pounds.

19         By February 5, 2011, Zamudio-Soto's symptoms had returned. Ex. 31 to Mot., at 100. At

20   that time, Dr. Neely believed that the most likely cause of Zamudio-Soto's returning symptoms

21   was the fact that she had recently gained 15 pounds. *Id.*

22         Three months later, on May 26, 2011, Zamudio-Soto made a post on her Facebook page

23   regarding the connection between her Mirena IUD and her PTC/IIH. Ex. 21 to Mot., at 202–203.

24   In the Facebook post, Zamudio-Soto included a link to a website on drugs.com. The website (1)

25   described the link between Mirena and PTC/IIH as "high[ly] plausib[le]" and (2) stated that a

26   patient with a PTC/IIH diagnosis should have the Mirena IUD removed. Ex. 40, at 4. In her

27

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

4

Facebook post, Zamudio-Soto stated that she would "tak[e] a printout" of the webpage to her doctor and that she "hope[d] this is the cause and that it can be taken out." Ex. 21, at 202–03. In her deposition testimony, Zamudio-Soto confirmed that at the time of the May 26, 2011 Facebook post, Zamudio-Soto had "made the connection . . . between Mirena and [her PTC/IIH]." *Id.*

Subsequently, on April 2, 2012, Zamudio-Soto met with Dr. Akila Annamalai and requested that she have her Mirena IUD removed and undergo a tubal ligation as a permanent contraceptive. Ex. 23 to Mot., at 62–64. Dr. Annamalai informed Zamudio-Soto that she would have to attend a class and that Dr. Annamalai would send the surgery request after Zamudio-Soto had attended the class. *Id.* However, there is no evidence that Zamudio-Soto attended the class, and the surgery never occurred.

On February 18, 2013, Zamudio-Soto emailed Dr. Annamalai and stated that she was concerned that Mirena was causing her PTC/IIH and that she wanted to have her Mirena device removed immediately and replaced with a non-hormonal IUD because she was concerned that Mirena was causing her PTC/IIH. Dr. Annamalai informed Zamudio-Soto that Dr. Annamalai "didn't know if" removing the Mirena "would [help] or not, but that we could give it a try." Ex. 21 to Mot., at 183. Dr. Annamalai removed the Mirena device on February 21, 2013. Zamudio-Soto claims that she has experienced significant (although not complete) relief from her PTC/IIH symptoms since the Mirena device was removed.

### B. Procedural History

Zamudio-Soto filed the complaint in the instant action on January 14, 2015. ECF No. 1. Bayer filed a motion to dismiss certain causes of action from the complaint on March 17, 2015. ECF No. 21. ECF No. 17. Zamudio-Soto then filed an amended complaint on March 31, 2015. ECF No. 18. In response, on April 2, 2015, Bayer filed a notice withdrawing its motion to dismiss. ECF No. 21. Bayer Healthcare then filed an answer to the amended complaint on April 14, 2015. ECF No. 22. Bayer OY filed an answer to the amended complaint on October 2, 2015. ECF No. 47.

Case No. 15-CV-00209-LHK
ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS MOOT

1    Pursuant to a stipulation of the parties, ECF No. 56, Zamudio-Soto filed a second amended

2    complaint ("SAC") on December 3, 2015, ECF No. 57. Bayer Healthcare and Bayer Pharma

3    answered the complaint on December 30, 2015. ECF Nos. 63–64. Bayer OY answered the

4    complaint on January 22, 2016, ECF No. 65.

5    Zamudio-Soto's SAC asserts nine causes of action on her own behalf: negligence, design

6    defect, failure to warn, strict liability, breach of implied warranty, breach of express warranty,

7    negligent misrepresentation, fraudulent misrepresentation, and fraud by suppression and

8    concealment. SAC ¶¶ 109–290. The SAC also asserts one loss of consortium claim on behalf of

9    Zamudio-Soto's husband, Fernando Soto. *Id.* ¶¶ 291–94.

10   After the close of discovery on November 10, 2016, *see* ECF No. 84, Bayer filed the

11   instant motion for summary judgment on December 8, 2016, ECF No. 90. Zamudio-Soto filed an

12   opposition to the motion for summary judgment on December 22, 2016. ECF No. 100. Bayer filed

13   a reply on December 29, 2016. ECF No. 103.

14   On December 8, 2016, Bayer filed a *Daubert* motion to exclude the testimony of Zamudio-

15   Soto's expert witnesses. ECF No. 93. Zamudio-Soto filed an opposition to the motion on

16   December 22, 2016. ECF No. 98. Bayer filed a reply on December 29, 2016. ECF No. 102.

17   On December 8, 2016, Bayer also filed a "Motion to Exclude Dr. Rosengart's Untimely

18   Disclosed General Causation Opinion Under Rule 37(c)(1)." ECF No. 91. Zamudio-Soto filed an

19   opposition to the motion on December 22, 2016. ECF No. 99. Bayer filed a reply on December 29,

20   2016. ECF No. 101.

21   On December 8, 2016, Zamudio-Soto filed a *Daubert* motion to exclude the testimony of

22   Bayer's expert witnesses. ECF No. 92. Bayer filed an opposition to the motion on December 22,

23   2016. ECF No. 97. Zamudio-Soto filed a reply on December 29, 2016. ECF No. 104.

24   On December 29, 2016, Plaintiffs in other cases involving Mirena and levonorgestrel-

25   induced PTC/IIH filed a motion before the Judicial Panel on Multidistrict Litigation ("JPML") to

26   transfer this case, along with over one hundred others, to the United States District Court for the

27

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

United States District Court
Northern District of California

6

1    Southern District of Mississippi for coordinated and/or consolidated pre-trial proceedings before

2    Chief Judge Louis Guirola, Jr. MDL No. 2767, ECF No. 1. The JPML has not yet set a hearing

3    date for the motion to transfer. ECF No. 115. This Court retains jurisdiction over the instant action

4    unless and until transfer to an MDL becomes effective. *See* Rules of Procedure of the Judicial

5    Panel on Multidistrict Litigation 2.1(d).

6    **II.     LEGAL STANDARD**

7            Summary judgment is appropriate if, viewing the evidence and drawing all reasonable

8    inferences in the light most favorable to the nonmoving party, "there is no genuine dispute as to

9    any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

10   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). At the summary judgment stage, the Court

11   "does not assess credibility or weigh the evidence, but simply determines whether there is a

12   genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006). A fact is "material" if

13   it "might affect the outcome of the suit under the governing law," and a dispute as to a material

14   fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of

15   the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence

16   is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at

17   249–50 (citations omitted).

18           The moving party bears the initial burden of identifying those portions of the pleadings,

19   discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*

20   *Corp.*, 477 U.S. at 323. Where the party opposing summary judgment will have the burden of

21   proof at trial, the party moving for summary judgment need only point out "that there is an

22   absence of evidence to support the nonmoving party's case." *Id.* at 325; *accord Soremekun v.*

23   *Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial

24   burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56,

25   "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

26   **III.    DISCUSSION**

27

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

United States District Court
Northern District of California

7

1    Bayer argues that the Court should grant summary judgment in Bayer's favor for several

2    reasons. First, Bayer argues that all of Zamudio-Soto's claims are untimely under the applicable

3    statute of limitations. Second, Bayer argues that Zamudio-Soto has not produced evidence to raise

4    a triable issue of fact regarding whether Mirena caused Zamudio-Soto's PTC/IIH. Third, Bayer

5    argues that there are no genuine issues of fact regarding Zamudio-Soto's failure-to-warn claims.

6    Fourth, Bayer argues that Zamudio-Soto's remaining claims fail as a matter of law.

7    As discussed further below, the Court agrees that Zamudio-Soto's claims are untimely

8    under the applicable two-year statute of limitations because her claims accrued on May 26, 2011,

9    and she did not file the complaint in the instant case until over three and a half years later, on

10   January 14, 2015. This alone warrants granting the motion for summary judgment. Therefore, the

11   Court need not reach Bayer's remaining arguments in support of the motion for summary

12   judgment.

13   **A.  Statute of Limitations**

14   In Bayer's motion for summary judgment, Bayer argues that Zamudio-Soto's claims are

15   untimely under California's applicable two-year statute of limitations for personal injury claims.

16   As Bayer points out, the bulk of the events in the complaint, including the implantation and

17   removal of the Mirena IUD, the diagnosis and treatment of Zamudio-Soto's PTC/IIH, and

18   Zamudio-Soto's injuries, occurred in California. *See McCann v. Foster Wheeler LLC*, 225 P.3d

19   516, 527 (Cal. 2010) (stating that a court should "appl[y] the law of the state whose interest would

20   be more impaired if its law were not applied.") (internal quotation marks omitted). Additionally,

21   Zamudio-Soto does not contest that California law applies. Thus, the Court applies California law.

22   Zamudio-Soto's SAC asserts claims arising from her personal injury from the Mirena

23   device for negligence, design defect, failure to warn, strict liability, breach of implied warranty,

24   breach of express warranty, negligent misrepresentation, fraudulent misrepresentation, fraud by

25   suppression and concealment, and loss of consortium. SAC ¶¶ 109–294. California law applies a

26   two-year statute of limitations for all personal injury claims, "regardless of the particular legal

27

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

United States District Court
Northern District of California

theory invoked." *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th Cir. 2002) (citing Cal. Civ. P. Code §335.1); *see also Rubino v. Utah Canning Co.*, 123 Cal. App. 2d 18, 26 (1954) ("[T]he legislative intent behind [§ 335.1] was not to restrict its coverage to tort actions independent of any contractual relation, but to provide a limitation . . . where personal injury or death results, regardless of the tort, contract or breach of express or implied warranty aspect of the case.").

Courts have applied this two-year statute of limitations to claims arising from a wide variety of legal theories. The personal injury statute of limitations has been applied to claims for breach of express warranty, breach of implied warranty, products liability, and negligence. *See Cardoso v. Am. Med. Sys., Inc.*, 183 Cal. App. 3d 994, 999-1000 (1986) (holding that the personal injury statute of limitations applies "where personal injury or death results, regardless of the tort, contract or breach of express or implied warranty aspects of the case"); *Clark v. Baxter Healthcare Corp.*, 83 Cal. App. 4th 1048, 1054 & n.2 (2000) (applying personal injury statute of limitations to action for products liability and negligence).

The personal injury statute of limitations has also been applied to derivative claims for loss of consortium. *See Jaeger v. Howmedica Osteonics Corp.*, 2016 WL 520985, at *11 (N.D. Cal. Feb. 10, 2016) ("Because each of Plaintiffs' causes of action is based on Ms. Jaeger's personal injury, even Mr. Jaeger's derivative cause of action for loss of consortium, the Court finds that the two-year personal injury statute of limitations controls."); *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 893 (N.D. Cal. 2013) (holding that "all of the [plaintiffs'] claims," including the claim for loss of consortium, "are subject to a two-year statute of limitations").

Finally, the personal injury statute of limitations has been applied to claims sounding in fraud. *See Clark*, 83 Cal. App. 4th at 1054 n.2 (applying the personal injury statute of limitations to a claim for fraudulent concealment "since this is a personal injury suit"); *Eidson*, 981 F. Supp. 2d at 893 (applying two-year statute of limitations to claims for fraudulent misrepresentation and fraudulent inducement); *Jaeger*, 2016 WL 520985, at *11 (holding that the "personal injury statute

United States District Court
Northern District of California

9

of limitations applies to fraud").[1]

Zamudio-Soto does not contest that the two-year statute of limitations applies to all of her causes of action. Therefore, the Court applies a two-year statute of limitations to Zamudio-Soto's claims. As discussed further below, Zamudio-Soto's claims accrued on May 26, 2011, when she made a Facebook post indicating that she believed Mirena may have caused her PTC/IIH. However, Zamudio-Soto did not file her complaint until over three and a half years later, on January 14, 2015. Thus, Zamudio-Soto's claims are untimely under the applicable two-year statute of limitations.

### i. Accrual and the Discovery Rule

Ordinarily, a personal injury cause of action accrues and the statute of limitations begins to run at the time of "the injury to the future plaintiff." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005). "An important exception to the general rule of accrual is the discovery rule, which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* (internal quotation omitted). Actual knowledge is not required for a cause of action to accrue under the discovery rule. Instead, under California law, "the statute of limitations begins to run when the plaintiff *suspects* or should suspect that her injury was caused by wrongdoing." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1988) (emphasis added); *see also O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1148 (9th Cir. 2002) (stating that the California state statute of limitations for personal injury is triggered by "suspicion alone").

In many cases, the defendant bears the burden of showing that an action is time-barred.

---

[1] Zamudio-Soto does not argue that her claims sounding in fraud should be subject to the three-year statute of limitations of Cal. Civ. P. Code § 338 rather than the two-year statute of limitations for personal injury actions. However, the Court notes that several courts have applied the two-year statute of limitations to personal injury claims sounding in fraud. *See Eidson*, 981 F. Supp. 2d at 893 (applying two-year statute of limitations to claims for fraudulent misrepresentation and fraudulent inducement); *Jaeger*, 2016 WL 520985, at *11 (holding that the "personal injury statute of limitations applies to fraud"). Additionally, in *Clark v. Baxter Healthcare Corp.*, 83. Cal. App. 4th 1048, 1054 n.2 (2000), the court explicitly addressed this argument and held that the three-year statute of limitations claim did not apply to fraud claims in personal injury actions. Moreover, as discussed further below, even if the three-year statute of limitations applied, Zamudio-Soto's claims accrued more than three years before she filed her complaint.

10

United States District Court
Northern District of California

1  *Kaiser Found. Hosps. v. Workers' Comp. Appeals Bd. (Martin)*, 39 Cal. 3d 57, 67 (1985) (placing

2  the burden on the defendant in most cases); *see also Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d

3  1402, 1406 (9th Cir. 1995) (state law allocates the burden of proof). However, "[a] plaintiff whose

4  complaint shows on its face that his claim would be barred without the benefit of the discovery

5  rule must specifically plead facts to show (1) the time and manner of discovery and (2) the

6  inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808; *see*

7  *also Eidson*, 981 F. Supp. 2d at 893 (same).

8  　　　In the instant case, Zamudio-Soto's complaint alleges that she suffered her injuries due to

9  PTC/IIH at least as early as September 2009. SAC ¶¶ 175–76 (describing "weigh gain, headaches,

10  ear pain, dizziness, and vision problems, including blurred vision."). The complaint also states that

11  Zamudio-Soto was diagnosed with PTC/IIH no later than September 16, 2009. *Id.* ¶¶ 179–80.

12  Thus, Zamudio-Soto's complaint establishes that her injury occurred at least as early as 2009.

13  Therefore, because Zamudio-Soto filed her complaint on January 14, 2015, the complaint "shows

14  on its face that [the] claim[s] would be barred without the benefit of the discovery rule." *Fox*, 35

15  Cal. 4th at 808. For that reason, in order to take advantage of the discovery rule exception,

16  Zamudio-Soto must specifically plead facts showing the time and manner of her discovery and her

17  inability to have made the discovery earlier. *See id.*

18  　　　However, Zamudio-Soto's complaint makes no mention at all of the discovery rule or the

19  applicable statute of limitations. Zamudio-Soto's complaint also contains no mention of tolling of

20  the statute of limitations due to fraudulent concealment, equitable tolling, or any other tolling

21  doctrine. Further, Zamudio-Soto's complaint contains no specific allegations regarding the time

22  and manner in which she discovered that Mirena may have caused her injuries or her inability to

23  have made the discovery earlier. Although Zamudio-Soto's complaint states that "[a]t no time

24  prior to her Mirena IUD removal in February 2013 was Plaintiff or her healthcare providers aware

25  of Mirena's link to her condition," *id.* ¶ 187, the complaint does not state when the discovery took

26  place or describe the manner of her discovery.

27

28  Case No. 15-CV-00209-LHK
　　ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
　　MOOT

United States District Court
Northern District of California

11

1    Additionally, the complaint contains no specific allegations regarding Zamudio-Soto's

2    inability to have made the discovery earlier. *See id.* ¶¶ 354, 394 (alleging, without specifying a

3    time, that "[a]t the time of Defendants' fraudulent misrepresentations and omissions, Plaintiff was

4    unaware and ignorant of the falsity of the statements and reasonably believed them to be true.").

5    At most, Zamudio-Soto's allegations establish that at some time, Zamudio-Soto was unaware that

6    certain misrepresentations were false. However, Zamudio-Soto's complaint does not specify that

7    Zamudio-Soto was deceived by such misrepresentations after her injury in 2009 or that these

8    misrepresentations caused an "inability to have made earlier discovery despite reasonable

9    diligence." *Fox*, 35 Cal. 4th at 808. These vague and "merely conclusory" allegations are

10   insufficient to allow Zamudio-Soto to rely on the discovery rule for delayed accrual of a cause of

11   action. *Eidson*, 981 F. Supp. 2d at 894; *see also Anderson v. Brouwer*, 99 Cal. App. 3d 176, 160

12   Cal. Rptr. 65 (1979) ("Formal averments or general conclusions to the effect that the facts were

13   not discovered until a stated date, and that plaintiff could not reasonably have made an earlier

14   discovery, are useless.").

15       This Court's decision in *Eidson v. Medtronic*, 981 F. Supp. 2d 868 (N.D. Cal. 2013), is

16   instructive. In *Eidson*, the plaintiffs' complaint stated in conclusory terms that "[d]espite diligent

17   investigation by Plaintiff into the cause of his injuries, including numerous consultations with . . .

18   medical providers, the nature of Plaintiff's injuries and damages, and their relationship to [the

19   product at issue] was not discovered, and through reasonable care and diligence could not have

20   been discovered, until a date within the applicable statute of limitations for filing Plaintiff's

21   claims." *Id.* at 893–94. The Court held that the plaintiffs' vague allegations were not sufficient to

22   show that the plaintiffs "deserve[d] the benefit of the discovery rule." *Id.* at 893. Specifically, the

23   Court held that the allegations were insufficient because the allegations did not "provide a certain

24   time at which [the plaintiffs] discovered the connection between [the product at issue] and the

25   injuries" and because the allegations regarding the plaintiffs' inability were "merely conclusory"

26   and "d[id] not offer any facts establishing what steps they actually took to investigate" the cause of

27

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

United States District Court
Northern District of California

1    the injury. *Id.* at 894.

2         In the instant case, Zamudio-Soto's allegations are even less detailed than the allegations

3    that the Court found insufficient in *Eidtronic*. Unlike the plaintiffs in *Eidtronic*, Zamudio-Soto

4    does not provide even conclusory allegations regarding her attempts to discover the source of her

5    injury. *Id.* Additionally, as in *Eidtronic*, Zamudio-Soto's complaint does not offer any facts

6    "establishing what steps [she] actually took to investigate" or "provide a certain time" at which

7    she discovered the connection between Mirena and her PTC/IIH. *Id.*

8         Thus, the allegations in Zamudio-Soto's complaint are insufficient to establish even a

9    prima facie case that she "deserve[s] the benefit of the discovery rule." *Id.* at 893. Next, the Court

10   considers the evidence in the record and finds that the record shows conclusively that Zamudio-

11   Soto's cause of action accrued no later than May 26, 2017.

12   **ii. The Undisputed Facts Confirm that Zamudio-Soto's Cause of Action Accrued No**
     **Later than May 26, 2011**

13        The undisputed evidence confirms that Zamudio-Soto cannot take advantage of the benefit

14   of the discovery rule because she made the connection between Mirena and her PTC/IIH on May

15   26, 2011, over three and a half years before filing her complaint.

16        Zamudio-Soto has pointed to no deposition testimony or any other evidence establishing

17   that she discovered the connection between Mirena and her PTC/IIH within two years of her

18   January 14, 2015 complaint. On the contrary, Zamudio-Soto's own deposition testimony makes

19   clear that Zamudio-Soto first made the connection between Mirena and her PTC/IIH no later than

20   May 26, 2011, almost two years before her Mirena was removed and over three and a half years

21   before she filed her complaint in the instant case.

22        On May 26, 2011, Zamudio-Soto made a post on her Facebook page regarding the

23   connection between her Mirena IUD and her PTC/IIH. Ex. 21 to Mot., at 202–203. Specifically,

24   the post included a link to the website "Mirena Disease Interaction" on drugs.com, which stated

25   that "Levonorgestrel (Includes Mirena)" posed a "severe potential hazard" of PTC/IIH with a

26   "high plausibility." Ex. 40 at 4.  The website also stated as follows:

27                                                    13

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

United States District Court
Northern District of California

> The use of levonorgestrel contraceptive implants is contraindicated in patients with a current or past history of idiopathic intracranial hypertension (pseudotumor cerebri, benign intracranial hypertension). This disorder is most commonly seen in obese women of reproductive age and has been reported in users of levonorgestrel implants. Patients who experience symptoms of this disorder (e.g., headaches associated with changing frequency, pattern, severity or persistence; visual disturbances) while on levonorgestrel therapy should be referred to a neurologist. If the diagnosis is confirmed, the implants should be removed permanently.

*Id.* Along with the link to the drugs.com website, Zamudio-Soto's Facebook post also stated the following:

> I have asked my doctor if my IUD could cause this, and he said no. I'm seeing him today and I'm taking a printout. I'm so upset right now, I have been crying, which I know it's making my headaches worse. Very frustrated. . . . I hope this is the cause and that it can be taken out and it will be the end of that, but I know it's not that simple. It seems like it never is. I just think of all the pain and suffering emotionally and physically for me and my husband and kids, that this could have been prevented. Ex. 21 to Mot., at 202–03.

In explanation of this May 26, 2011 Facebook post, Zamudio-Soto testified at her deposition as follows:

> Q. And so you had an idea that your Mirena might be linked to your [PTC/IIH] at this time?
>
> A. Yes.
>
> . . .
>
> Q. So by this time you had made a connection –
>
> A. Yes.
>
> Q. Okay.
>
>       -- between Mirena and your [PTC/IIH]?
>
> A. Yes.

*Id.* Zamudio-Soto does not contest that she made the Facebook post in question or that she made these statements under oath at her deposition. Instead, Zamudio-Soto states that "[t]he drugs.com website . . . is an unreliable source that any reasonable plaintiff would discredit." Opp. at 18. However, in order for a cause of action to accrue under the discovery rule, a plaintiff need not *know* the source of her injury. Instead, as discussed above, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing." *Jolly v.*

14

United States District Court
Northern District of California

1   *Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1988); *see also O'Connor v. Boeing North American, Inc.*,

2   311 F.3d 1139, 1148 (9th Cir. 2002) (stating that the California state statute of limitations for

3   personal injury is triggered by "suspicion alone.").

4          In other words, even if the drugs.com website was not sufficiently authoritative to establish

5   for certain that Mirena was the cause of Zamudio-Soto's PTC/IIH, the website was sufficient to

6   give a reasonable plaintiff "suspicion of wrongdoing" and an incentive to further investigate.

7   *Rosas v. BASF Corp.*, 236 Cal. App. 4th 1378, 1389 (2015). Additionally, it is clear from

8   Zamudio-Soto's deposition testimony that Zamudio-Soto did in fact credit the information on the

9   website enough to make a connection between Mirena and her PTC/IIH. Ex. 21 to Mot., at 202–03

10  ("Q. So by this time you had made a connection - - A. Yes."). "[S]ubjective suspicion" is

11  sufficient for a cause of action to accrue under the discovery rule. *Utterkar v. Ebix, Inc.*, 2014 WL

12  5019921, at *6 (N.D. Cal. Oct. 6, 2014) (quoting *Mangini v. Aerojet–Gen. Corp.*, 230 Cal. App.

13  3d 1125, 1150 (Ct. App. 1991)). Thus, because Zamudio-Soto, by her own admission, actually

14  suspected that her Mirena IUD caused her PTC/IIH on May 26, 2011, Zamudio-Soto's cause of

15  action accrued at that time.

16         Zamudio-Soto does not contest that she made the May 26, 2011 Facebook post or that she

17  "made a connection" between Mirena and her PTC/IIH at the time of the May 26, 2011 Facebook

18  post. Ex. 21 to Mot., at 202–03. Instead, Zamudio-Soto argues that the drugs.com website was

19  insufficient to put Zamudio-Soto on inquiry notice because the bottom of the website contained a

20  generic disclaimer stating that "[i]f you have questions about the drugs you are taking, check with

21  your doctor, nurse, or pharmacist." Opp. at 18; Ex. 41 to Mot., at 7. In her opposition to the instant

22  motion, Zamudio-Soto argues that the information on the drugs.com website could not have put

23  her on inquiry notice because "[i]n light of this information discovered on Drugs.com, Ms.

24  Zamudio-Soto, as instructed [by the disclaimer], consulted her medical providers, who told her

25  that the Mirena IUD was not the cause of her PTC/IIH." Opp. at 18.

26         However, Zamudio-Soto's statement is misleading. Zamudio-Soto's opposition brief

27

28  Case No. 15-CV-00209-LHK
    ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
    MOOT

United States District Court
Northern District of California

implies that she consulted her doctors after her Facebook post and that her doctors denied a link between Mirena and PTC/IIH. In support of this claim, the opposition brief cites page 216 of Zamudio-Soto's deposition testimony. *Id.* However, on this page of her deposition testimony, Zamudio-Soto testifies only that at the time of her Facebook post, Zamudio-Soto's "doctors *had* told [her] that [Mirena] wasn't" the cause of her PTC/IIH. Ex. 21 to Mot., at 216 (emphasis added). In other words, Zamudio-Soto's doctors told her that Mirena was not the cause of her PTC/IIH *before* she discovered the drugs.com website and made the Facebook post.

The Facebook post itself confirms this testimony. In the Facebook post, Zamudio-Soto stated that her doctor *had* denied that Mirena was the cause of her PTC/IIH but that after reading the drugs.com website, Zamudio-Soto believed that her PTC/IIH might be connected to Mirena and would "tak[e] a printout" of the website when she visited her doctor later that day. Ex. 21 to Mot., at 202–03. Neither the deposition testimony nor any other evidence to which Zamudio-Soto points shows whether Zamudio-Soto actually followed up with her doctor or what her doctor said at that time. Thus, Zamudio-Soto's statement that she consulted her medical providers "in light of th[e] information on the Drugs.com website" and that her medical providers denied the connection between Mirena and her PTC/IIH is not supported by the record. Opp. at 18.

Further, Zamudio-Soto's statement in her opposition that she consulted Dr. Annamalai in light of the information on the drugs.com website and that Dr. Annamalai "in effect" denied a relationship between Mirena and PTC/IIH is also misleading. First, this conversation with Dr. Annamalai occurred nearly two years after Zamudio-Soto's May 26, 2011 Facebook post. *See* Ex. 21 to Mot., at 183 (stating that the conversation with Dr. Annamalai occurred on February 21, 2013). Thus, even if the conversation with Dr. Annamalai was an effort to follow up on the information from the drugs.com website, the two-year gap demonstrates that Zamudio-Soto did not make a timely effort to "go find the facts" after learning of a possible connection between Mirena and her PTC/IIH on May 26, 2011. *Jolly*, 44 Cal. 3d at 1111

Additionally, Dr. Annamalai did not deny that Mirena could cause Zamudio-Soto's

16

United States District Court
Northern District of California

1    PTC/IIH. On the contrary, according to Zamudio-Soto's own account of the conversation, Dr.

2    Annamalai "just said that she didn't know if" removing the Mirena IUD would help Zamudio-

3    Soto's PTC/IIH "or not, but that we could give it a try." Ex. 21 to Mot., at 183. Thus, it is clear

4    that Dr. Annamalai's discussion with Zamudio-Soto did not deprive Zamudio-Soto of inquiry

5    notice that Mirena might be the cause of her PTC/IIH.

6           Zamudio-Soto's actions are also inconsistent with her argument that Dr. Annamalai's

7    statement caused Zamudio-Soto to believe that Mirena was not the cause of her PTC/IIH. Just

8    before her consultation with Dr. Annamalai, Zamudio-Soto specifically requested that Dr.

9    Annamalai remove the Mirena device because Zamudio-Soto believed it had caused her PTC/IIH.

10   Ex. 21 to Mot., at 183. Then, after the consultation with Dr. Annamalai, Zamudio-Soto still

11   insisted on removing the Mirena device. *Id.* Finally, soon after the Mirena device was removed,

12   Zamudio-Soto claims that she experienced relief that further convinced her that Mirena had been

13   the cause of her PTC/IIH. Opp. at 18. Thus, it is clear that Dr. Annamalai's statements did not

14   change Zamudio-Soto's mind about Mirena.

15          The facts of this case are very similar to the facts addressed by the Ninth Circuit in

16   *Henderson v. Pfizer*, 285 F. App'x 370 (9th Cir. 2008) (unpublished). In *Henderson*, the plaintiff

17   argued that her claim against Pfizer, which manufactured an IUD that allegedly rendered plaintiff

18   infertile, accrued only when the plaintiff's doctor told her that the IUD had made her infertile. *Id.*

19   at 372. However, the Ninth Circuit held that the plaintiff's action was untimely because her cause

20   of action accrued earlier, "when an ultrasound discovered the IUD and Henderson expressed

21   concern that the device was causing her pain and may have affected her fertility." *Id.* Specifically,

22   the Ninth Circuit noted that soon after the ultrasound, the plaintiff wrote a letter in which she

23   mentioned other lawsuits regarding the same IUD and stated that "I don't know if the claims of the

24   other women . . . are correct, but we will find out as soon as we can." *Id.*

25          The Ninth Circuit held that "[t]his letter demonstrates that Henderson was alerted to the

26   possibility that her IUD had caused fertility problems and intended to further investigate." *Id.*

27

17

28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

Thus, the Ninth Circuit held that the plaintiff's cause of action arose at least at the time of the letter. *Id.* Similarly, in the instant case, Zamudio-Soto's Facebook post demonstrated that Zamudio-Soto was "alerted to the possibility that her IUD had caused [PTC/IIH] and intended to further investigate." *Id.* Thus, at the latest, Zamudio-Soto's cause of action arose at the time of the Facebook post on May 26, 2011.

Indeed, Zamudio-Soto's Facebook post is even more indicative of suspicion than the letter in *Henderson*. In *Henderson*, the Ninth Circuit found that the plaintiff's cause of action accrued at the time of the letter even though the plaintiff's letter indicated that at the time of the letter, the plaintiff did not even know that she was infertile. *Henderson*, 285 F. App'x at 372 ("[M]y husband and I anticipate conceiving a child once [the IUD is] removed."). In the instant case, in contrast, Zamudio-Soto had already been diagnosed with PTC/IIH in 2009 and had been suffering from symptoms for years before her May 26, 2011 Facebook post.

Additionally, in *Henderson* the Ninth Circuit found that its conclusion was "unaffected by [the plaintiff's] claim that after her surgery on March 20, 2002 to remove the IUD, her doctor told her on a follow-up visit to 'go make babies.'" 285 F. App'x at 373. The Ninth Circuit held that "no reasonable trier of fact could interpret this as a definitive opinion that conception was actually possible, much less a statement that could reasonably *eliminate* Henderson's suspicion that the IUD made her infertile." *Id.* (emphasis in original). Similarly, in the instant case, Dr. Annamalai's statement that she "didn't know if" removing the Mirena IUD would help Zamudio-Soto's PTC/IIH, Ex. 21 to Mot., at 183, was clearly insufficient to "*eliminate*" Zamudio-Soto's suspicion that the Mirena IUD caused her PTC/IIH. *Henderson*, 285 F. App'x at 373.

Thus, under California and Ninth Circuit law, Zamudio-Soto's cause of action accrued on May 26, 2011. However, Zamudio-Soto did not file her complaint until over three and a half years later, on January 14, 2015. Therefore, Zamudio-Soto's claims are untimely.

**iii. Summary**

Although ordinarily the question of when accrual occurred under the delayed-discovery

18

Case No. 15-CV-00209-LHK
ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS MOOT

rule is a question of fact, a court may resolve the question as a matter of law on a motion for summary judgment if "the evidence can support only one reasonable conclusion." *Ovando v. County of Los Angeles*, 159 Cal. App. 4th 42, 61, 71 Cal.Rptr.3d 415 (2008) (citations omitted). The undisputed evidence in this case, and particularly Zamudio-Soto's own admissions in her deposition testimony, show unequivocally that at the time Zamudio-Soto made her Facebook post on May 26, 2011, Zamudio-Soto at least had a suspicion that her Mirena IUD caused her PTC/IIH. Under California law, "[s]o long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *Jolly*, 44 Cal. 3d at 1111. Thus, Zamudio-Soto's cause of action accrued on May 26, 2011 at the latest.

Although Zamudio-Soto's cause of action accrued on May 26, 2011 at the latest, Zamudio-Soto did not file her complaint in the instant case until January 14, 2015, more than three and a half years later. Therefore, the Court finds that Zamudio-Soto's claims are untimely. Because the Court finds that Zamudio-Soto's claims are untimely, the Court need not address Bayer's remaining arguments for summary judgment.

The Court therefore GRANTS Bayer's motion for summary judgment. Additionally, because the Court grants Bayer's motion for summary judgment on grounds of untimeliness, the Court need not decide Bayer's *Daubert* motion to exclude the testimony of Zamudio-Soto's expert witnesses, ECF No. 93, Bayer's "Motion to Exclude Dr. Rosengart's Untimely Disclosed General Causation Opinion Under Rule 37(c)(1)," ECF No. 91, or Zamudio-Soto's *Daubert* motion to exclude the testimony of Bayer's witnesses. ECF No. 92. The Court therefore DENIES these motions to exclude as moot.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Bayer's motion for summary judgment. ECF No. 90. The Court DENIES as moot Bayer's *Daubert* motion to exclude the testimony of Zamudio-Soto's expert witnesses, ECF No. 93, Bayer's "Motion to Exclude Dr. Rosengart's Untimely Disclosed General Causation Opinion Under Rule 37(c)(1)," ECF No. 91, and Zamudio-

19

Case No. 15-CV-00209-LHK
ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS MOOT

1    Soto's *Daubert* motion to exclude the testimony of Bayer's expert witnesses. ECF No. 92.

2    **IT IS SO ORDERED.**

3

4    Dated: January 27, 2017

5                                                    *Lucy H. Koh*
                                                     _____
6                                                    LUCY H. KOH
                                                     United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                           20
28   Case No. 15-CV-00209-LHK
     ORDER GRANTING SUMMARY JUDGMENT AND DENYING MOTIONS TO EXCLUDE TESTIMONY AS
     MOOT

United States District Court
Northern District of California